**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAISA KURDI, | Case No.: 1:22-cv-00729 JLT EPG |
| Plaintiff, | ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS |
| v. | |
| CALIFORNIA DEPARTMENT OF TRANSPORTATION, and Does 1-100, | (Doc. 12) |
| Defendants. | |

Maisa Kurdi alleges she was subjected to harassment, discrimination, and retaliation while employed by the California Department of Transportation. (*See generally* Doc. 1.) She brings nineteen claims—under federal and state law—against Caltrans. (*Id.*) Caltrans moves to dismiss the complaint in its entirety, arguing that Kurdi's state law claims are barred by the Eleventh Amendment and her Title VII claims fail under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 12.) The Court finds the matter suitable for decision without oral argument pursuant to Local Rule 230(g) and General Order 618. For the reasons set forth below, Caltrans' motion to dismiss is **GRANTED IN PART**.

**I.     Background and Allegations**

In 2018, Kurdi began her employment with Caltrans as a transportation engineer and remains employed by Caltrans today. (Doc. 1 at ¶ 15.) When hired, she was assigned to work in Bakersfield under the supervision of Senior Transportation Engineer, Michael Garrett. (*Id.* at ¶ 17.) It is Caltrans' policy that employees working a night shift do so for the entire week. (*Id.* at ¶ 26.) Notwithstanding,

Kurdi alleges she was asked to work a weekday morning shift after working night shifts earlier in the week. (*Id*. at ¶¶ 25, 27.) Kurdi was told that "there was no night work" in explanation for the shift change, yet there was night work, and it was assigned to a male co-worker. (*Id*. at ¶ 28.) In October 2018, Kurdi alleges she was subjected to harassment and discrimination when Transportation Engineering Technicians Paul Shaw and Samuel Felix denied her proper training by telling her to "watch the carpenters" instead of training her themselves. (*Id*. at ¶¶ 29, 35-37.) Kurdi told Garrett about the incident and asked him to investigate, but he refused. (*Id*. at ¶¶ 43-44.) At a later point in time, Kurdi was transferred to Visalia, where coworkers and contractor employees whistled at her and made kissing sounds as she walked by. (*Id*. at ¶¶ 46-47.) Kurdi also believes that Caltrans employees and contractor workers took "unwanted pictures of her during work hours, circulated them among themselves and made sexually suggestive comments about her, which management was aware of and failed to take all reasonable steps to prevent." (*Id*. at ¶ 48.) When Kurdi told Garrett that she was uncomfortable working in a hostile environment, he responded that he didn't know how to deal with the matter. (*Id*. at ¶¶ 50-51.) She then had a meeting with Supervisor Gordon, who told her she had to be "tough" and tell the men to stop. (*Id*. at ¶¶ 53-54.)

In December 2018, a coworker took multiple "unwanted and intrusive" photos and videos of Kurdi, while telling her how beautiful she was and refusing to stop when asked repeatedly. (Doc. 1 at ¶¶ 55-62.) She explained the situation to Garrett, who provided her with incident paperwork to complete. (*Id*. at ¶ 63.) Kurdi filed a complaint and EEO issued a report that "substantiate[d]" that the employee's actions violated policy. (*Id*. at ¶ 64.) Kurdi also alleges that a contractor, Juan Salas, attempted helping her clean her shoes while others made comments such as "Oooo." (*Id*. at ¶¶ 66-67.) Salas asked what Kurdi's plans were after work and told her he could "take her to a nice hotel on a vacation." (*Id*. at ¶¶ 69-70.) Kurdi considered the interaction with Salas a "[s]exual [r]equest." (*See id*. at ¶ 66.) She reported the incident to Transportation Engineer Mike Gahli[1], who advised her to stay away from Salas and assured Kurdi he would "do that area of oversight." (*Id*. at ¶ 72.) Kurdi then

---

[1] The Court intends no disrespect in the event Mr. Gahli's name is misspelled. Kurdi uses the spelling "Gahli" and Ghali." (*See* Doc. 1 at ¶¶ 72, 76.)

2

reported the incident to Amrijit Dhaliwal[2], who told her they could arrange a meeting with Salas because it was "not ok." (*Id*. at ¶¶ 73-74.) The meeting never occurred. (*Id*. at ¶ 75.)

In March 2019, Kurdi witnessed another contractor hit Gahli. (Doc. 1 at ¶ 76.) She reported the incident to Garrett, and in retaliation, he told Kurdi to leave the work site. (*Id*. at ¶¶ 77-78.) In July 2019, a co-worker took unwanted photos and/or video of Kurdi while he was supposed to be directing traffic. (*Id*. at ¶¶ 83-85.) Kurdi complained to Garrett, and he gave her paperwork to complete. (*Id*. at ¶¶ 96-97.) About two weeks later, Garrett retaliated against Kurdi by transferring her from the field to office work "doing nothing essentially." (*Id*. at ¶ 98.) This continued for two weeks, which denied her "field work training and overtime pay opportunities."[3] (*Id*. at ¶¶ 98, 100.) Later, Kurdi requested to work a 16-hour shift to attend a work-related class. (*Id*. at ¶ 103.) Dhaliwal denied her request while a male coworker's request was granted. (*Id*.) Kurdi also alleges Garrett excluded her from a weekly management meeting, denying her "important project information." (*Id*. at ¶¶ 104-05.) She was told the photos taken during the July 2019 incident were shared at the "[a]ll-[m]ale meeting." (*Id*. at ¶ 106.) At some point, Kurdi went on vacation due to stress and upon returning, she learned that the coworker accused of assault was allowed to return to work after a two-week suspension. (*Id*. at ¶¶ 112, 114-15.) In response, she complained that the work environment was hostile, but Garrett maintained his position, and Gordon did "nothing." (*Id*. at ¶¶ 116-18.) Kurdi further alleges she reported violations of Caltrans safety policies (*see id*. at ¶¶ 96-97, 123[4], 130, 133); she suffered from several panic attacks, was hospitalized, and was diagnosed with severe anxiety and post-traumatic stress disorder (*see id*. at ¶¶ 130, 140-41, 144, 160, 162, 164, 172); and submitted disability paperwork demonstrating her anxiety diagnosis (*see id*. at ¶ 151)—most of which led to what Kurdi believed to be retaliatory

---

[2] The Court reiterates its previous footnote with respect to Mr. Dhaliwal. Kurdi uses "Amrajit," "Amarjit," and "Dhaliwal." (*See* Doc. 1 at ¶¶ 103, 148-49.)

[3] It does not appear this retaliation occurred in response to Kurdi's complaint in 2019. It seems to have occurred sometime in 2017, according to Kurdi's recollection of the July 17, 2017 trucking accident allegedly caused by Garrett isolating Kurdi in the office and there being "no one out in the field to monitor traffic." (Doc. 1 at ¶ 98.) Upon filing a complaint, no corrective action was taken. (*Id*. at ¶ 102.)

[4] Importantly, the complaint's paragraph numbers are only in chronological order up to paragraph 137, at which point the numbers restart at 121. (*See* Doc. 1 at ¶ 20:17-19.) Thus, paragraph 123 in this context is the "second" paragraph 123. (*See id*. at ¶¶ 20:22, 17:125-126.) Similarly, paragraph 130 is the "first" of its kind with respect to reporting a safety violation, while the "second" paragraph 130 concerns Kurdi's anxiety attack, both of which are potential protected activities. (*See id*. at ¶¶ 18:9, 21:6.) The Court also notes that paragraphs 133, 134, and 135, some of which have not yet been addressed, are also the first of two. (*See id*. at ¶¶ 18:12-13, 21:10-11.)

conduct. (*See* Doc. 1.) Ultimately, Kurdi volunteered to work for the California Department of Health during the pandemic "to avoid having to work in [Caltrans'] hostile environments." (*Id.* at ¶¶ 168-69.)

Based upon these allegations,[5] Kurdi brings the following causes of action: (1) violation of California Government Code § 1102.5 (retaliation); (2) violation of California Labor Code § 98.6 (retaliation); (3) violation of California Labor Code § 6310 (retaliation); (4) violation of California Government Code § 12940 (retaliation); (5) violation of California Government Code § 12940 (failure to prevent harassment, discrimination, and/or retaliation); (6) violation of 42 U.S.C. § 2000e-3(a) (retaliation); (7) violation of California Government Code § 12940 (racial and sexual harassment and discrimination); (8) violation of California Government Code § 12940 (publication); (9) violation of California Government Code § 12940 (training); (10) violation of 42 U.S.C. § 2000e-2(a)(1) (sex discrimination); (11) violation of 42 U.S.C. § 2000e-2(a)(1) (race discrimination); (12) violation of 42 U.S.C. § 2000e-2(a)(2) (limit, segregate, classify); (13) breach of mandatory duties; (14) negligence *per se*; (15) intentional infliction of emotional distress; (16) violation of California Government Code § 12940 (disability); (17) violation of California Labor Code § 204 (payment of wages); (18) violation of California Government Code § 12940 (failure to reasonably accommodate); (19) violation of California Government Code § 12940 (failure to engage in good faith interaction for reasonable accommodation). (Doc. 1.) Caltrans filed the instant motion to dismiss on July 22, 2022. (Doc. 12.) Kurdi filed an opposition on August 5, 2022, (Doc. 14), to which Caltrans replied on August 12, 2022. (Doc. 15.)

## II.     Motion to Dismiss under 12(b)(6)

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal of a claim under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Thus, under Rule 12(b)(6), "review is limited to the complaint alone." *Cervantes v. Porterville of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993).

---

[5] Plaintiff asserts numerous factual allegations, some of which are not relevant to the discussion and therefore not included here.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (internal citations omitted).

"The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The Court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Assoc. v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). To the extent pleading deficiencies can be cured by the plaintiff alleging additional facts, leave to amend should be granted. *Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

## III.     Discussion and Analysis

### A.     State Claims

As an initial matter, Caltrans argues that all non-federal causes of action be dismissed as they are barred by the Eleventh Amendment. (*See* Doc. 12.) Kurdi concedes this point. (Doc. 14 at 12-13.) Accordingly, claims (1) through (5), (7) through (9), and (13) through (19) are **DISMISSED** without prejudice. Remaining before the Court are Kurdi's federal claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*.

### B.     Title VII Claims

Kurdi asserts four Title VII claims against Caltrans: retaliation (claim 6), disparate treatment sex discrimination (claim 10), disparate treatment race discrimination (claim 11), and disparate impact

discrimination (claim 12). (Doc. 1 at ¶¶ 211-217, 230-250.)[6]

"The purpose of Title VII is . . . through law to liberate the workplace from the demeaning influence of discrimination, and thereby to implement the goals of human dignity and economic equality in employment." *Christian v. Umpqua Bank*, 984 F.3d 801, 814 (9th Cir. 2020). Under Title VII, it is an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). The Supreme Court has consistently held that the first subsection, § 2000e–2(a)(1), represents "disparate treatment" and subsection § 2000e–2(a)(2) represents "disparate impact." *See, e.g.*, *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015); *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 249 (2005) (O'Connor, S., concurring); *Raytheon v. Hernandez*, 540 U.S. 44, 52 (2003); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986-87 (1988); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 (1977). The Supreme Court elucidated this point in *Smith*:

> Paragraphs (a)(1) and (a)(2) do differ in one informative respect. The employer actions targeted by paragraph (a)(1)—*i.e.*, refusing to hire, discharging, or discriminating against—are *inherently harmful* to the targeted individual. The actions referred to in paragraph (a)(2), on the other hand—*i.e.*, limiting,

---

[6] Generally, the Eleventh Amendment bars suits against a state unless the state waives its sovereign immunity or Congress abrogates that immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456-57 (1976); *Sharnese v. California*, 547 F. App'x 820, 822 (9th Cir. 2013). First, Caltrans is a state agency, *Nat. Res. Def. Council v. California Dep't of Transp.*, 96 F.3d 420, 423 (9th Cir. 1996), which Kurdi acknowledges. (*See* Doc. 1 at ¶ 10.) Second, Congress abrogated a state's Eleventh Amendment immunity when the state is sued as an "employer" pursuant to a Title VII claim. *Fitzpatrick*, 427 U.S. at 455-57; *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 279 (1997) (clarifying *Fitzpatrick*'s holding that authorizing Title VII claims against the state "does not violate the Eleventh Amendment since Congress was exercising its § 5 remedial powers"); *Sosa v. Hiraoka*, 920 F.2d 1451, 1461 (9th Cir. 1990) ("Indeed, in 1972 Congress amended Title VII specifically to subject states and their subdivisions to Title VII actions…."). Finally, neither party argues that Caltrans does not qualify as an "employer" under Title VII. Thus, Kurdi's Title VII claims are not barred by the Eleventh Amendment.

1    segregating, or classifying—are *facially neutral.*

2    *Id.* at 249 (emphasis in original). Thus, a plaintiff alleging discrimination under Title VII may only

3    proceed under these two provisions. *Abercrombie*, 575 U.S. at 771 ("These two proscriptions, often

4    referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate

5    impact' provision, are the only causes of action under Title VII."); *Hardie v. Nat'l Collegiate Athletic*

6    *Ass'n.*, 97 F. Supp. 3d 1163, 1167 (S.D. Cal. 2015), *aff'd sub nom.* 861 F.3d 875 (9th Cir. 2017) ("A

7    plurality of the Supreme Court has gone on [to] distinguish Title VII's two antidiscrimination sections

8    … disparate impact claims are cognizable under § 2000e–2(a)(2) but not under § 2000e–2(a)(1).").

9                            1.      Retaliation

10    Title VII also makes it unlawful "for an employer to discriminate against any of his employees

11    . . . because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or

12    because he has made a charge, testified, assisted, or participated in any manner in an investigation,

13    proceeding, or hearing under [Title VII] . . .." 42 U.S.C. § 2000e-3(a). Accordingly, an "employer can

14    violate the anti-retaliation provisions of Title VII in either of two ways: (1) if the adverse employment

15    action occurs because of the employee's opposition to conduct made unlawful [by Title VII]; or (2) if

16    it is in retaliation for the employee's participation in the machinery set up by Title VII to enforce its

17    provisions." *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997).

18    To state a cognizable claim for retaliation in violation of Title VII, a plaintiff must sufficiently

19    plead that: (1) he engaged in a protected activity; (2) his employer subjected him to an adverse

20    employment action; and (3) there is a causal link between the protected activity and the adverse

21    action. *Bleeker v. Vilsack*, 468 Fed.Appx. 731, 732 (9th Cir. 2012); *Ray v. Henderson*, 217 F.3d 1234,

22    1240 (9th Cir. 2000). Although a prima facie case need not be established at the pleading stage,

23    *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), a complaint still must state a plausible claim

24    sufficient to put the defendant on notice of the claim and the grounds it rests upon. *Id.* at 512; *see also*

25    *Iqbal,* 556 U.S. at 678 (a complaint must contain sufficient factual matter to state a plausible claim for

26    relief); *Lee v. Hertz Corp.*, 330 F.R.D. 557, 561 (N.D. Cal. 2019) ("Plaintiffs need not prove the prima

27    facie elements to survive a motion to dismiss, but must plead the general elements to make a claim

28    facially plausible.").

Caltrans seeks dismissal of Kurdi's Title VII claims, contending the complaint fails to state a claim because it "consists of numerous inchoate and jumbled facts and pictures that fail entirely to meet settled pleading standards." (Doc. 12-1 at 2.) Caltrans continues that:

> The Complaint in this case fails to provide Caltrans with fair notice as to which of the 174 factual allegations support Plaintiff's claims under Title VII . . . Instead, the Complaint consists of factual allegations that are not in any logical sequence, are incomplete in many cases and make no sense in others, contains random pictures and internet links with no reference, refers to multiple people by first name without explaining who they are, who employees them, or how they are relevant to this lawsuit, and otherwise requires that Caltrans parse through all of these 174 paragraphs to attempt to discern what the grounds are for this lawsuit.

(*Id*. at 7.)

As Caltrans indicates, it is unclear which allegations correlate with Kurdi's claims. Caltrans does not acknowledge that neither side analyzed the claims in their briefing, nor did either party attempt to identify which allegations relate—or appear to relate—or engage in even minimal analysis. It is not the Court's responsibility to parse through misnumbered and excessive pleadings on Kurdi's behalf, especially given the extraordinary lack of resources and impacted caseload in this district.[7] It is also not the Court's duty to address a moving party's scant argument; a catch-all effort that provides little guidance. *See Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.") quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). In the interest of justice, however, the Court will address the allegations it finds supportive of Kurdi's Title VII claims.

### a.    Protected activity

For an employee's "opposition" to be protected, the conduct that the employee opposed "must fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation." *Learned v.*

---

[7] Kurdi relies on a 9th Circuit decision in arguing the complaint is to be "liberally construed in favor of [Kurdi]." (Doc. 14 at 11.) However, *Doe v. United States*, 419 F.3d 1058 (9th Cir. 2005) does not stand for this contention. *See id*. at 1062 ("On a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff, taking all her allegations as true and drawing all reasonable inferences from the complaint in her favor."). As noted above, this is the standard followed by the Court as well. *See Student Loan Marketing*, 181 F.R.D. at 634. However, Kurdi misses the mark because she is not proceeding *pro se*; she is represented by counsel. *Precision Toxicology, LLC v. MacRory*, 2021 WL 1610059, at *10 (S.D. Cal. Apr. 26, 2021) (explaining that because defendant was represented by counsel, the court had no duty to interpret the First Amended Counter Complaint liberally) (citing *Brown v. Dep't of Pub. Safety*, 446 F. App'x 70, 73, 2011 WL 3240811 (9th Cir. 2011)) (unpublished).

*Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988). Conduct constituting a "protected activity" under Title VII includes filing a charge or complaint, testifying about an employer's alleged unlawful practices, and "engaging in other activity intended to oppose an employer's discriminatory practices." *Raad v. Fairbanks N. Star Borough*, 323 F.3d 1185, 1197 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)) (internal quotation marks omitted).

Kurdi alleges she was harassed after complaining of race discrimination. (Doc. 1 at ¶ 215.) In general, complaining to an employer regarding discrimination is a protected activity. *See Ray*, 217 F.3d at 1240 n. 3 (informal complaints are considered a protected activity under Title VII). However, Kurdi does not direct the Court to any allegations of retaliation upon complaining of race discrimination. The single allegation pertaining to Kurdi's race does not involve opposition activity. (*See* Doc. 1 at ¶ 20 ("[Kurdi] is an Arabic Muslim and notices that CalTrans places white nonminorities [sic] persons in one work group and minorities in another group.").) Nonetheless, there are potential activities leading to allegations of retaliation that the Court can glean from the complaint, including: (1) reporting harassment, discrimination, and/or retaliation (*See id*. at ¶¶ 43, 47-50, 63-64, 72-73, 96-97, 102, 116, 135, 170, 174); (2) reporting a co-worker's assault (*see id*. at ¶¶ 77, 111); (3) reporting violations of Caltrans safety policies (*see id*. at ¶¶ 96-97, 123, 130, 133); (5) suffering from panic attacks and Post Traumatic Stress Disorder (*see id*. at ¶¶ 130, 140, 144, 160, 162, 172); and (6) submitting disability leave paperwork. (*See id*. at ¶ 151.)

As noted above, employee activities not intended to oppose an unlawful employment practice are not considered "protected activities" for purposes of Title VII. *See* 42 U.S.C. § 2000e-3(a); *Raad*, 323 F.3d at 1197. In addition, the challenged conduct must "fairly fall within the protection" of Title VII. *Soga v. Kleinhans*, 2016 WL 4192411, at *10 (E.D. Cal. Aug. 9, 2016) (quoting *Learned*, 860 F.2d at 932). While this does not require an "in fact" violation of Title VII, "the opposition clause, by its terms, protects only those employees who oppose what they reasonably perceive as discrimination *under [Title VII]*." *Learned*, 860 F.2d at 932 (emphasis in original); *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526-27 (9th Cir. 1994); *see also Albro v. Spencer*, 2019 WL 2641667, at *9 (E.D. Cal. June 27, 2019 ("The disputed employment practices need not have been actually unlawful; it is only necessary that a plaintiff show that her belief that an unlawful employment practice

1   occurred was 'reasonable.'") (citing *Moyo v. Gomez*, 40 F.3d 982, 985 (9th Cir. 1994)).

2        As a result, if an employee does not sufficiently allege that she opposed discrimination based

3   upon race, color, religion, sex, or national origin, she cannot claim that she engaged in a protected

4   activity. *See Learned*, 860 F.2d at 932 (affirming dismissal of retaliation claim because the plaintiff

5   "did not allege that he ever opposed any discrimination based upon race, color, religion, sex, or

6   national origin" and could not reasonably have believed he was discriminated against because he did

7   not allege that he was); *Bruner v. City of Phoenix*, 2020 WL 5258295, at *5 (D. Ariz. Sept. 2,

8   2020), *appeal dismissed sub nom. Cerda v. City of Phoenix*, 2021 WL 4472738 (9th Cir. May 19,

9   2021) (finding summary judgment proper where the plaintiff failed to show she reasonably believed

10  the challenged conduct violated Title VII). Thus, reporting coworkers' safety violations; reporting a

11  witnessed non-sexual assault[8]; suffering from panic attacks and/or PTSD; and submitting disability

12  leave paperwork, do not constitute activity intended to oppose unlawful employment practices. *See*,

13  *e.g.*, *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1299 (N.D. Cal. 2020) (collecting cases to demonstrate

14  that reporting OSHA violations or complaining about "unsafe working conditions" are not protected

15  activities under Title VII); *Collins v. XL Constr.*, 2020 WL 509036, at *4 (E.D. Cal. Jan. 31,

16  2020), *report and recommendation adopted*, 2020 WL 1139517 (E.D. Cal. Mar. 9, 2020) ("Workplace

17  safety is not a protected activity under Title VII."); *Grenier v. Spencer*, 2013 WL 211130, at *9 (E.D.

18  Cal. Jan. 18, 2013) ("The fact that an employment practice may be offensive or illegal does not make

19  it discriminatory based on race or gender."); *Handson v. Overlake Hosp. Med. Ctr.*, 2017 WL

20  1438037, at *6 (W.D. Wash. Apr. 24, 2017) (finding the plaintiff's accusation of assault did not

21  "constitute opposition to employment practices forbidden by Title VII"). Nor could Kurdi have

22  reasonably believed she was discriminated against, given that she does not allege she opposed

23  discrimination, with respect to these activities, on the basis of race, color, religion, sex, or national

24  origin. *Learned*, 860 F.2d at 932. Therefore, these activities are not protected under Title VII. On the

25  other hand, reporting harassment, discrimination, and/or retaliation, or what an employee reasonably

26

27

---

28  [8] In fact, Kurdi asserts that the assault she witnessed violated California Penal Code section 242, not Title VII. (*See* Doc. 1 at ¶ 76.)

1  believes to be a violation of Title VII, may constitute a protected activity.[9] *Id.*; *Ray*, 217 F.3d at 1237.

2  The Court will next examine the alleged adverse employment actions in relation to protected activity.

3             *b.*     *Adverse employment action*

4         "[A]n adverse employment action is one that materially affects the compensation, terms,

5  conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.

6  2008) (internal quotation marks and citation omitted); *see also Burlington N. & Santa Fe Ry. Co. v.*

7  *White*, 548 U.S. 53, 68 (2006) (specifying that the challenged action must be "materially adverse,"

8  meaning that it would dissuade a reasonable worker from exercising protected rights); *Ray*, 217 F.3d

9  at 1242–43.[10] In *Ray*, the Ninth Circuit determined "a wide array of disadvantageous changes in the

10  workplace constitute adverse employment actions." *Id.* at 1240. For example, adverse employment

11  actions may include a transfer of job duties, undeserved performance ratings, and the dissemination of

12  unfavorable job references. *Id.* at 1241 (internal citations and quotation marks omitted).

13         However, not every employment decision constitutes an adverse employment action. *Brooks v.*

14  *City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). "[O]nly non-trivial employment actions that

15  would deter reasonable employees from complaining about Title VII violations will constitute

16  actionable retaliation." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 693 (9th Cir. 2017). The

17  Ninth Circuit expanded the scope of examination when it held that an action must be viewed through

18  an objective lens as well as a subjective lens for purposes of determining reasonableness. *See Vasquez*

19  *v. Cnty. of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003), *as amended* (Jan. 2, 2004) (interpreting the

20

21  ------------------------

22  [9] Kurdi alleges the filing of additional EEO complaints, which is generally a protected activity. However, Kurdi does not allege she was subjected to an adverse employment action for filing. (*See, e.g.*, Doc. 1 at ¶¶ 63-64, 170.) Accordingly, these allegations will not be considered in examining Kurdi's Title VII retaliation claim.

23

24  [10] The Ninth Circuit has applied both the deterrence test and the materiality test. *See Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (holding that "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity"); *but see Davis*, 520 F.3d at 1090

25  (finding adverse employment action where the terms and conditions of the plaintiff's employment were materially affected). On the other hand, this district relied on a U.S. Supreme Court decision in holding there

26  was no real distinction between the two. *See Soga*, 2016 WL 4192411, at *10 ("[A] plaintiff must show that a reasonable employee would have viewed the challenged action materially adverse, meaning it might well have

27  dissuaded a reasonable worker from making or supporting a charge of discrimination.") (quoting *Burlington*, 548 U.S. at 60 (internal quotation marks omitted)). The Court agrees with *Burlington* by way of *Soga* that these

28  tests are one and the same.

standard to include subjectivity "because the EEOC manual speaks of any adverse treatment that is . . . reasonably likely to deter *the charging party* or others from engaging in protected activity") (emphasis in original) (internal quotation marks omitted). Even so, the Court clarified that the conduct must still be "reasonably likely to deter the protected activity, even by the charging party." *Id.*

The Court cannot discern precisely what Kurdi claims to be adverse employment actions. Specifically, Kurdi alleges that she was *harassed* by employees for complaining about *race discrimination*, and in the same paragraph alleges that Caltrans participated or encouraged the conduct, or "did not act to end it," which indicated that *discrimination* was the adverse employment action. (*See* Doc. 1 at ¶ 215.) However, many allegations of retaliation are not claimed to be harassment or race discrimination. Given this lack of clarity, the Court identifies the following possible adverse employment actions that, as pled, tailed a protected activity[11]:

1. Supervisor Garrett "refuse[d]" to investigate an instance of harassment and/or discrimination. (Doc. 1 at ¶¶ 42-44.)

2. After complaining of sexual harassment, Garrett tells Kurdi he does not know how to handle the matter, and Supervisor Gordon tells her she must be "tough" and tell the workers to stop. (*Id.* at ¶¶ 51, 53-54.)

3. Supervisor Dhaliwal told Kurdi that the two of them as well as a co-worker accused of sexual harassment would have a meeting to discuss the event at issue, but the meeting never took place. (*Id.* at ¶¶ 74-75.)

4. Garrett's face turned red, and he was silent in response to Kurdi's complaints and fears of being attacked by other workers. (*Id.* at ¶ 135.)

5. Kurdi was assigned to office work for two weeks after complaining to Garrett that a co-worker violated sexual harassment rules by taking unwanted photographs and videos of her. (*Id.* at ¶ 98.)

6. Kurdi's schedule change request was denied by Dhaliwal after filing an EEO complaint. (*Id.* at ¶¶ 102-03.)

---

[11] There are additional allegations of adverse employment actions not preceded by protected activity under Title VII and for this reason, the Court declines to address them. (*See, e.g.,* Doc. 1 at ¶¶ 21-28; ¶ 46; ¶ 151, ¶ 159.)

7.   Kurdi was excluded from a weekly meeting, which denied her important project information. (*Id.* at ¶¶ 104-05.)

8.   After a two-week suspension, the worker accused of assault was allowed to return to work. (*Id.* at ¶¶ 114-15.) In response, Kurdi told Garrett the work environment was hostile, but he maintained his position. (*Id.* at ¶¶ 116-17.) Gordon did nothing. (*Id.* at ¶ 118.)[12]

9.   Kurdi's "hardship request" to be transferred to another district was denied. (*Id.* at ¶ 176.)

Taking each in turn, Kurdi does not sufficiently allege the existence of an adverse employment action as to the first four events indicated above. The failure to investigate generally does not amount to an adverse action. *See Huddleston v. City & Cnty. of San Francisco*, 2016 WL 4729175, at *4 (N.D. Cal. Sept. 12, 2016) ("[P]laintiff's allegations that defendants failed to investigate her complaints are insufficient to raise an inference that defendants' failure to act was motivated by discriminatory or retaliatory intent.") (citing *Brown*, 446 F. App'x at 72); *see also McAllister v. Adecco USA Inc.*, 2018 WL 6112956, at *8 (D. Haw. Nov. 21, 2018), *aff'd sub nom. McAllister v. Brunk*, 812 F. App'x 708 (9th Cir. 2020) (failure to investigate is not an adverse employment action); *Blount v. Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077, 1082 (N.D. Cal. 2013), *aff'd*, 624 F. App'x 965 (9th Cir. 2015) (no adverse employment action unless a plaintiff's requests are repeatedly refused or ignored); *McKissick v. City of Reno*, 2019 WL 3241161, at *12 (D. Nev. July 18, 2019) ("[A]ccepting Plaintiffs' reliance on the handling of the investigations to establish adverse employment action would erode the policy reason for encouraging employers to investigate complaints for fear that an investigation would lead to a claim of retaliation based on an inadequate investigation."); *McEnroe v. Microsoft Corp.*, 2010 WL 4806864, at *5 (E.D. Wash. Nov. 18, 2010) ("Even had [Defendant] actually ignored Plaintiff's complaints, that mere failure to investigate itself did not adversely affect the terms or conditions of Plaintiff's employment."). The first four events entail the failure to investigate and/or

---

[12] Kurdi also alleges that prior to the suspension, she "support[ed]" Ghali's assault complaint in her daily report. (Doc. 1 at ¶ 111.) As discussed above, this is not a protected activity. Furthermore, Kurdi fails to allege that this "participation" was met with an adverse employment action.

13

act. These are not adverse employment actions.

Moreover, these four events don't materially affect the compensation, terms, conditions, or privileges of employment (*Davis*, 520 F.3d at 1089) and would not deter a reasonable worker from reporting Title VII violations. *Burlington*, 548 U.S. at 68; *Brooks*, 229 F.3d at 928. The Court also notes that consideration of Kurdi's subjective view under *Vasquez* leads to the inference that she was not deterred from complaining of violations, being that she did so on more than one occasion thereafter. V*asquez*, 349 F.3d at 646. For example, after complaining of harassment in "late February or early March 2019," (Doc. 1 at ¶ 73), Kurdi made at least five additional complaints, beginning in or around July 2019. (*See, e.g., id.* at ¶¶ 96, 102, 116, 135, 170.) Garrett personally provided her with the appropriate paperwork to file a complaint on at least two occasions. (*See e.g., id.* at ¶¶ 63, 97.) Kurdi is also still employed by Caltrans. (*Id.* at ¶ 9.) Together, the Court finds Kurdi does not allege facts sufficient to support the conclusion that she was subjected to an adverse employment action based upon these events.

The fifth event, transferring Kurdi from field work to office work, may amount to an adverse employment action. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding the transfer of job duties constitutes adverse employment action); *see also Ray*, 217 F.3d at 1242 (considering disadvantageous transfers and schedule changes to be adverse); *St. John v. Employment Development Dep't*, 642 F.2d 273, 274 (9th Cir. 1981) (affirming a district court's conclusion that a transfer to another job of the same pay and status may constitute an adverse employment action); *Vasquez*, 349 F.3d at 646 (Ferguson, W., dissenting) (indicating that with respect to a transfer to a field position, he "would explicitly find that an adverse employment action in fact exists for purposes of [plaintiff's] retaliation claim" as opposed to assuming it did, like the majority).

Unlike in *Vasquez*, where the plaintiff was deterred by the transfer—when he withdrew his grievance upon learning transferring was his only option—Kurdi does not allege that she withdrew any of her complaints in order to avoid the transfer. *Vasquez*, 349 F.3d at 646. Nevertheless, *Vasquez* was a unique case in that there aren't typically facts showing actual deterrence. *Id*. Thus, in viewing the circumstances, the Court finds that, as pled, the transfer amounts to an adverse employment action. Kurdi alleges that her office work assignments were nearly non-existent, which denied her field work

training and overtime opportunities. (*Id*. at ¶¶ 98, 100.) The Court considers this a disadvantageous transfer. *Ray*, 217 F.3d at 1242. Although the reassignment lasted only two weeks, it is still plausible that being transferred from hands-on experience in the field to undesired office work of minimal importance could dissuade an employee from exercising her protected rights. *See Burlington*, 548 U.S. at 68. At the pleading stage, no more is required. Therefore, the Court finds Kurdi sufficiently pleads that she was subjected to an adverse employment action when Garrett transferred her.

The sixth event, being denied a schedule change request, may also constitute an adverse employment action. In *Smith v. Cnty. of Santa Clara*, the plaintiff requested to work an extra day in order to take a day off for Thanksgiving, which was granted and subsequently revoked. 2016 WL 4076193, at *5 (N.D. Cal. Aug. 1, 2016). To the extent the plaintiff's claim relied on the denial of a schedule request or the revocation of an approved request, the court found a triable issue of fact as to whether the denial was for a legitimate, non-discriminatory reason. *Id*. at *18. Comparably, Kurdi alleges that sometime after she filed an EEO complaint regarding Garrett's transfer, she requested to work overtime to attend a work-related training. (Doc. 1 at ¶¶ 102-03.) Dhaliwal denied her request without explanation. (*Id*. at ¶ 103.) If proven, this would constitute an adverse employment action. Thus, Kurdi sufficiently pleads facts to support the conclusion that she suffered an adverse employment action based on the denial.

The seventh event, being excluded from a weekly work meeting, does not rise to the level of an adverse employment action in this case. Kurdi alleges that sometime after she filed a complaint, Garrett excluded her from a weekly meeting, which denied her "important project information." (Doc. 1 at ¶¶ 104-05.) She also alleges that the photos from the sexual harassment event that led to her transfer were shared during the meeting. (*Id*. at ¶ 106.) While social ostracism is not an adverse employment action, exclusion from work-related meetings, or other actions that interfere with an employee's job, may be. *Davis*, 520 F.3d at 1090; *Manatt v. Bank of Am., NA*, 339 F.3d 792, 803 (9th Cir. 2003) (citing *Brooks*, 229 F.3d at 929; *Ray*, 217 F.3d at 1241); *see also Hellman v. Weisberg*, 360 F. App'x 776, 778 (9th Cir. 2009) (unpublished disposition) ("[O]stracism by coworkers does not constitute an adverse employment action, at least where it does not have an effect on the employee's ability to perform her job."). In *Davis*, the Ninth Circuit distinguished its case from other circuit

decisions:

> Davis's alleged exclusion from the trailer and from radio communications was not mere ostracism, however. We have previously characterized behavior as mere ostracism when a supervisor "stared at [the Plaintiff] in an angry way and allowed [her] co-workers to be mean to her," *Manatt v. Bank of America, NA,* 339 F.3d 792, 803 (9th Cir. 2003), and when "males in the office refused to speak to [the Plaintiff] about anything other than work." *Brooks v. City of San Mateo,* 229 F.3d 917, 928–29 (9th Cir. 2000).
>
> Davis's ban from an important area of the workplace, the trailer, is more severe than these types of exclusion, particularly because there is evidence that the restriction prevented her from discussing work matters with her supervisor.

520 F.3d at 1090.

Similar to the facts in *Davis,* Kurdi does not merely allege that she was ignored, stared at, or mocked in retaliation for making an EEO complaint. Instead, she was excluded from a work-related meeting, which prevented her from accessing work-related information. (Doc. 1 at ¶ 105.) The meeting also appears to have been, at least in part, associated with the incident of harassment directly involving Kurdi. (*Id*. at ¶ 106.) Assuming Kurdi was entitled to attend—and regularly attended—the weekly meetings, Caltrans' exclusion could be materially adverse. Fatal to her claim, however, is that Kurdi does not allege the exclusion occurred more than once.[13] In *Davis,* the Court based its decision on allegations that the plaintiff was excluded from numerous meetings; ignored by supervisors when she called by radio; given "discriminatory work assignments;" and banned from an important area of the workplace, which prevented her ability to discuss work matters with her supervisor. *Davis,* 520 F.3d at 1090. The Court explicitly noted that it considered the actions collectively and declined to decide whether one of the actions, standing alone, would be sufficient to establish an adverse employment action. *Id.*

Critically, such allegations are lacking in Kurdi's complaint. Being excluded from one weekly meeting is not sufficient to alter the terms, conditions, or privileges of employment. Nor would it deter a reasonable employee from complaining of Title VII violations. *Ray,* 217 F.3d at 1243; *see also*

---

[13] In fact, Kurdi alleges elsewhere in the complaint that she was no longer invited to meetings and that necessary project information was withheld from her. (Doc. 1 at ¶ 134.) However, Kurdi asserts that these actions were in retaliation for reporting safety violations. (*See id*. at ¶¶ 133-34.) As explained previously, reporting safety violations is not a protected activity and therefore, these allegations will not be considered here.

*Brooks*, 229 F.3d at 928 (only "non-trivial" actions that would deter a reasonable employee are actionable). Kurdi's ability to discuss work matters with management was due yet denied. Nonetheless, such exclusion does not amount to a material change in the terms and conditions of Kurdi's employment sufficient to plead she suffered an adverse employment action under Title VII. *Davis,* 520 F.3d at 1090.

In the eighth event, the employee accused of assault was allowed to return to work after a two-week suspension. (*Id.* at ¶¶ 114-15.) In response, Kurdi complained to Garrett that the work environment was hostile, but he maintained his position. (*Id.* at ¶¶ 116-17.) Gordon did nothing. (*Id.* at ¶ 118.) Kurdi does not sufficiently allege that Garrett's decision was an adverse employment action. Ghali's complaint was validated, and the employee was reprimanded prior to Kurdi's complaint. Kurdi points to no authority to support that Garrett maintaining a prior decision in response to her complaint is an adverse employment action.[14] Notwithstanding either of these reasonings, Garrett and Gordon's inaction, as discussed above, does not amount to an adverse employment action under these circumstances. *McEnroe*, 2010 WL 4806864, at *5. Nor do the facts imply that the supervisors' inaction could deter a reasonable employee from complaining. Thus, as to Garrett maintaining his decision and Gordon doing nothing, Kurdi fails to sufficiently allege that she suffered an adverse employment action.

Lastly, Kurdi contends her request to transfer to another district was denied. (Doc. 1 at ¶ 176.) Such actions may qualify as adverse employment actions under Title VII. *See Yarztzoff*, 809 F.2d at 1376; *Campbell v. State Dep't of Educ.*, 892 F.3d 1005, 1013 (9th Circ. 2018) (observing the denial of a transfer request may be an adverse employment action where such transfer would be "a material employment benefit"); *Leland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1097 (N.D. Cal. 2008) ("acts such as termination, failure to promote, denial of transfer, or refusal to hire ... are

---

[14] Nor does Kurdi sufficiently allege that Garrett's action was linked to her complaint. Garrett's decision to maintain his position came after the worker's suspension. *See Soga*, 2016 WL 4192411, at *12 (finding no causal link between the plaintiff's complaint and her employer's decision to allow wrongdoer to return to work because the decision came after her complaint and the suspension,). Moreover, Kurdi has not alleged that absent her complaint, Garrett would have changed his mind. *See id.* (granting summary judgment because, *inter alia*, there was no material dispute as to whether defendants would have "responded differently" if not for the plaintiff filing a complaint).

actionable 'unlawful employment practices'") (emphasis omitted) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).

Kurdi requested to transfer to a different district for "health issues and the hostile work environments." (Doc. 1 at ¶ 174.) She asserts that though Caltrans had the ability to grant the request, it was denied. (*Id.* at ¶¶ 175-76.) First, to the extent Kurdi alleges the denial was based on her disability or medical condition, this is not protected activity under Title VII. *Doutherd v. Montesdeoca*, 2020 WL 6043952, at *17 (E.D. Cal. Oct. 13, 2020), *aff'd sub nom. Doutherd v. United Parcel Serv., Inc.*, 2022 WL 17582527 (9th Cir. Dec. 12, 2022) (explaining that disability discrimination can only be raised under FEHA or ADA). On the other hand, the Court construes the request based on a *hostile work environment* as a complaint and, therefore, protected activity under Title VII. Kurdi alleges her doctor wrote a note stating she was "suffering from PTSD as a result of the hostile working conditions at Caltrans." (Doc. 1 at ¶ 172.) Her doctor recommended she be transferred to another district "to avoid returning to the same hostile work site." (*Id.* at ¶ 173.) Kurdi not only suffered from PTSD, a serious and potentially harmful condition, she alleges it was a direct result of her work environment. (*Id.* at ¶ 172.) More importantly, despite the doctor's conclusion that Kurdi's PTSD diagnosis was as a result of her "hostile working conditions at Caltrans," it appears Caltrans disregarded the doctor's recommendation that Kurdi be transferred. (*Id.* at ¶¶ 172, 176.) The Court finds this allegation, at the pleading stage, to be sufficient to constitute an adverse working condition.

In summary, the Court finds Kurdi sufficiently alleges the existence of an adverse employment action when she was (1) involuntarily transferred to office work; (2) denied a schedule change request; and (3) denied a transfer request.

### c.   Causal link

The requisite causal link between protected activity and an adverse employment action may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff*, 809 F.2d at 1375. Notably, "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1065 (9th Cir. 2002).

As noted above, reporting harassment, discrimination, and/or retaliation generally constitutes protected activity under Title VII. *Learned*, 860 F.2d at 932; *Ray*, 217 F.3d at 1237. In addition, Plaintiff alleges she suffered adverse employment actions by being transferred to office work, denial of her scheduling request, and denial of her transfer request. Accordingly, the Court must determine whether the complaint sufficiently alleges a causal link between her identified protected activities and the adverse actions suffered therefrom.

i.      *Transfer to office work*

According to Kurdi, a co-worker took unwanted pictures and/or videos of her while he was supposed to be directing traffic, which she terms "visual harassment." (Doc. 1 at ¶¶ 83-84, 88, 90.) She complained to Garrett about the sexual harassment, and he provided her paperwork to fill out. (*Id.* at ¶¶ 96-97.) About two weeks later[15], Kurdi alleges Garrett retaliated against her by removing her from field work, confining her to office work for two weeks, and assigning her minimal tasks. (*Id.* at ¶ 98.) She asserts the transfer deprived her of "field work training and overtime pay opportunities." (*Id.* at ¶ 100.) Given the short period of time—two weeks—between Kurdi's complaint and Garrett transferring her to office work, a causal link may be inferred between Kurdi's protected activity and the adverse employment action. *See, e.g., Yartzoff*, 809 F.2d at 1376 (inferring causation where adverse employment actions took place less than three months after the plaintiff's complaint where his supervisors were aware of his Title VII charges and his participation in administrative investigations); *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within months of protected activity where supervisor knew of the employee's complaint). Accordingly, Kurdi sufficiently alleges a claim of retaliation based on the transfer.

///

---

[15] The Court assumes that the complaint inadvertently reads "July 17, 2017," when it was intended to read "July 17, 2019." (Doc. 1 at ¶ 98.) Kurdi complained of sexual harassment on July 2, 2019 (*Id.* at ¶ 84.) Kurdi alleges that "no one [was] out in the field to monitor traffic" when she was assigned office work in retaliation, and implies that as a result, a deadly crash occurred. (*Id.* at ¶ 98.) The website cited in the complaint dated the crash July 17, 2019. (*Id.*) It is reasonable to infer that the retaliation came after Kurdi complained, as Kurdi did not begin her employment with Caltrans until 2018. (*Id.* at 15.) Thus, the Court will construe July 17, 2019 as the date of retaliation.

## ii.     Denied schedule change request

Kurdi alleges that in response to Garrett's retaliation, she filed an EEO complaint, but no corrective action was taken. (Doc. 1 at ¶ 102.) At some point following her complaint, Kurdi requested to work a 16-hour shift to attend a pre-paid work-related training. (*Id*. at ¶ 103.) Dhaliwal denied her request and granted the same request to a male co-worker. (*Id*.) When Kurdi asked about the "disparate treatment," Dhaliwal laughed and gave no explanation. (*Id*.) Importantly, Kurdi does not allege when her request was denied in relation to when she filed the complaint such to support an inference of causation based on temporal proximity.[16] Moreover, Kurdi fails to allege facts that support a conclusion that Dhaliwal knew of her complaint. *Yartzoff*, 809 F.2d at 1376; *see also Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."). Therefore, the facts alleged are insufficient to support a causal link between Kurdi's protected activity and Dhaliwal's adverse employment action.

## iii.    Denied transfer request

Lastly, Kurdi alleges that her doctor diagnosed her with PTSD due to her hostile work conditions and recommended she transfer to another district. (Doc. 1 at ¶¶ 172-73.) Thereafter, Kurdi filed a hardship request to transfer based in part on a hostile work environment (*Id*. at ¶ 174), but her request was denied.

Kurdi fails to allege facts to support the inference of causation. If an employer was obliged to grant every transfer request based on a purported Title VII violation, else be exposed to liability for retaliation, it would disrupt the "balance" the Ninth Circuit strives to reach:

> In *Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859 (9th Cir. 1996), we noted that "[n]ot every employment decision amounts to an adverse employment action." *Id.* at 869. We recognize the countervailing concerns in this area of the law. On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a "get out of jail free" card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions. In an effort

---

[16] The first reference to dates following these allegations were events that occurred before the retaliation. (*See* Doc. 1 at ¶¶ 113 [February 1, 2019], 121 [July 3, 2019].)

> to strike the proper balance, we have held that only non-trivial employment actions
> that would deter reasonable employees from complaining about Title VII violations
> will constitute actionable retaliation.

*Brooks*, 229 F.3d at 928.; *See also, e.g., McKissick*, 2019 WL 3241161, at *12 (in the context of investigations, "reliance on the handling of the investigations to establish adverse employment action would erode the policy reason for encouraging employers to investigate complaints for fear that an investigation would lead to a claim of retaliation"). Based upon the foregoing, Kurdi sufficiently alleges a claim of retaliation based on being transferred to office work after complaining of harassment. She fails to state any other claim of retaliation. Thus, as to the transfer, Caltrans' motion to dismiss is **DENIED** but is granted in the other respects.

### 2.    Discrimination

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). This guarantees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). A plaintiff may show discrimination in violation of Title VII by proving disparate treatment or impact, or by establishing the existence of a hostile work environment. *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991) (citing *Teamsters*, 431 U.S. at 335 n.15). Kurdi alleges she suffered discrimination based on race and sex, but her complaint does not identify whether her claims are based on disparate treatment or hostile work environment. (*See* Doc. 1 at ¶¶ 230-47.)

### a.    Hostile work environment

"A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Brooks*, 229 F.3d at 923. "Workplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787-788 (1998)). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotation marks and citations omitted).

To state a hostile work environment claim based on race or sex, a plaintiff must sufficiently allege: "(1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642; *see also Mack v. California Dep't of Corr. & Rehab.*, 2018 WL 932235 (E.D. Cal. Feb. 16, 2018), *aff'd*, 790 F. App'x 846 (9th Cir. 2019) (race); *Fuller*, 865 F.3d at 1161 (sex).

### i.      Race

Kurdi alleges she was subjected to "unwanted racial discrimination because she was a Muslim female" and the "harassing conduct … altered the conditions of employment and created a hostile and/or abusive work environment." (Doc. 1 at ¶¶ 242-43.) The Court need not take conclusory allegations as true. *See Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

Notably, Kurdi fails to describe racist conduct by her coworkers or supervisors. Kurdi's sole factual allegation citing race states that she is an "Arabic Muslim and notices that CalTrans places white nonminorities [sic] persons in one work group and minorities in another group." (Doc. 1 at ¶ 20.) This is insufficient to support a conclusion of race discrimination based on a hostile work environment. *See Alatraqchi v. Uber Techs., Inc.*, 2013 WL 4517756, at *6 (N.D. Cal. Aug. 22, 2013) ("Plaintiff must allege more than his subjective belief that Defendant Munro had hatred towards Iraqis or Shiite Muslims; Plaintiff must allege the facts that support Plaintiff's conclusions.").

### ii.      Sex

Kurdi alleges she was the subject of harassment on multiple occasions, such as when co-workers whistled and made kissing sounds directed at her, which she tried "her best to ignore." (Doc.

1 at ¶¶ 47, 49.) Based on this incident, Kurdi told Garrett she was uncomfortable working in a hostile working environment. (*Id.* at ¶ 50.) Kurdi also alleges that "numerous" co-workers and contractors took unwanted photos of her and made "sexually suggestive comments about her." (*Id.* at ¶ 48.) According to Kurdi, in December 2018, another co-worker "sexually harassed" her by taking "unwanted and intrusive picture(s)" of her and telling her she is "so beautiful." (*Id.* at ¶¶ 55-56, 59.) She told him to stop twice, at which point he started video-recording her.[17] (*Id.* at ¶ 60.) The employee asked her what she was doing after work. (*Id.* at ¶ 69.) She responded, "not much," and he proposed taking her on vacation. (*Id.* at ¶¶ 69-70.) She denied his request, walked away, and reported the incident. (*Id.* at ¶¶ 71-72.) Another co-worker "visually harass[ed]" her when he took photos of her while on break and while trying to sleep. (*Id.* at ¶¶ 83, 85, 88, 90.) She demanded that he stop, delete the photos, and apologize, but he "refuse[d]." (*Id.* at ¶ 91.) She then reported the incident as a violation of, in relevant part, sexual harassment rules. (*Id.* at ¶ 96.)

In the aggregate, these allegations sufficiently support the conclusion that Kurdi was subjected to unwelcome sexual conduct that was severe and pervasive enough to alter her conditions of employment and unreasonably interfere with her work performance. *Clark County*, 532 U.S. at 270-71; *Vasquez*, 349 F.3d at 642. Along with the other discriminatory allegations pled throughout the complaint, the elements of a hostile work environment claim are sufficiently set forth. In fact, she alleges the cumulative impact of this conduct led to her mental breakdown. She suffered from several panic attacks, which led to her being hospitalized, she was diagnosed with severe anxiety, and put on medical leave. (*See* Doc. 1 at ¶¶ 140-41, 164.) She was diagnosed with PTSD, which Kurdi's doctor noted was specifically caused by the hostile work environment at Caltrans. (*Id.* at ¶ 172.) She even temporarily transferred to work with CDPH to avoid her working conditions. (*Id.* at ¶ 168-69.) At this stage, Kurdi's allegations are sufficient to state a claim for sex discrimination based on a hostile work environment. To this extent *only*, Caltrans' motion is **DENIED**.

///

---

[17] Kurdi also alleges that when a contractor-employee helped clean her shoes in front of a work crew, they crew members said, "Oooo." (*Id.* at ¶¶ 66-67.) This embarrassed her. (*Id.* at ¶ 68.) While juvenile, alone, this does not demonstrate conduct that a reasonable person in her position would conclude was sexually harassing.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### b. Disparate treatment

"A person suffers disparate treatment in her employment when she is singled out and treated less favorably than others similarly situated." *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). A plaintiff asserts a valid Title VII claim for race or sex discrimination based on disparate treatment if she sufficiently alleges that (1) she belongs to a class protected by Title VII; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) "the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff." *Cornwell,* 493 F.3d at 1028 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

#### i. Race

Kurdi alleges she is an "Arabic Muslim" (Doc. 1 at ¶ 20), though Muslims are adherents of the Islamic faith. *See Guthrey v. California Dep't of Corr. & Rehab.*, 2012 WL 2499938, at *6 n.2 (E.D. Cal. June 27, 2012) (clarifying that Muslim "does not represent race, ancestry or national origin" but is "an individual who is a believer in or adherent of the Islamic faith"); *see also Skylstad v. Fischer*, 2020 WL 5821714, at *1 (W.D. Wash. Feb. 25, 2020), *report and recommendation adopted*, 2020 WL 3819235 (W.D. Wash. July 8, 2020) (separating race from religion in describing inmate as "a black male and a devout Muslim"). Irrespective of whether Kurdi intended to bring a religious discrimination claim or the race claim identified in the complaint, her disparate treatment claim fails. Kurdi makes no other reference to religion, let alone the religion any Caltrans employee or co-worker. She likewise fails to describe any conduct suggesting she was treated differently due to being of Arab descent. Thus, Kurdi does not allege sufficient facts to support a conclusion of race discrimination based on disparate treatment.

#### ii. Sex

"[T]o assert a valid Title VII claim for sex discrimination, a plaintiff must make out a prima facie[18] case establishing that the challenged employment action was either intentionally discriminatory

---

[18] As discussed above, a plaintiff need not establish a prima facie case, but must, at minimum, allege the elements and sufficient facts to put the defendant on notice. *Swierkiewicz*, 534 U.S. at 512; *Lee*, 330 F.R.D. at 561.

1   or that it had a discriminatory effect on the basis of gender." *Jespersen v. Harrah's Operating*, 444

2   F.3d 1104, 1109 (9th Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802; *Harriss v. Pan Am.*

3   *World Airways, Inc.*, 649 F.2d 670, 673 (9th Cir. 1980).

4           As a female, Kurdi is a member of a protected class. *See, e.g.*, *Terry v. City of San Diego*, 380

5   F. App'x 591, 593 (9th Cir. 2010). Kurdi suffered an adverse employment action, as discussed above.

6   She also alleges facts sufficient to support a conclusion that she was treated differently than similarly

7   situated males. *Cornwell,* 493 F.3d at 1028. For example, she was scheduled a day shift after working

8   a night shift, in violation of Caltrans policy. (*See* Doc. 1 at ¶¶ 25-28.) She was told there were no night

9   shifts available, yet the shift was given to a male co-worker. (*Id.* at ¶ 28.) She was excluded from an

10  all-male meeting. (*Id.* at ¶¶ 104-05.) Her request to not work with a particular employee was denied

11  while the two male engineers' same requests were granted. (*Id.* at ¶¶ 148-49.) This is sufficient to

12  demonstrate that Kurdi was treated differently than her male coworkers and that her male co-

13  workers—with qualifications similar to Kurdi's— were treated more favorably. Kurdi fails, however,

14  to sufficiently allege the second element of a disparate treatment claim—that she was performing her

15  job satisfactorily or meeting her employer's expectations. *Cornwell,* 493 F.3d at 1028; *see also*

16  *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir. 1998) (requiring a plaintiff to show "she

17  was performing according to her employer's legitimate expectations"). Thus, Kurdi has not alleged

18  facts sufficient to support a claim for disparate treatment on the basis of sex.

19                          *c.*      *Disparate impact*

20          Kurdi's final Title VII claim is based on limiting, segregating, or classifying in violation of 42

21  U.S.C. § 2000e–2(a)(2). (Doc. 1 at ¶¶ 248-50.) As explained above, this is considered the "disparate

22  impact" provision. *Abercrombie*, 575 U.S. at 771; *Smith*, 544 U.S. at 249. "Disparate impact occurs

23  'when employment practices that are facially neutral in their treatment of different groups fall more

24  harshly on one group than another.'" *Freeman v. Cnty. of Sacramento Dep't of Hum. Assistance*, 2020

25  WL 2539268, at *3 (E.D. Cal. May 19, 2020) (quoting *Sheppard v. David Evans & Assocs.*, 694 F.3d

26  1045, 1050 n. 1 (9th Cir. 2012)); *see also Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (defining

27  disparate impact as "practices that are not intended to discriminate but in fact have a

28  disproportionately adverse effect on minorities"); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431

(1971) (explaining that both "overt discrimination" and "practices that are fair in form, but discriminatory in operation" are proscribed by Title VII). To establish a prima facie case of disparate impact under Title VII, a plaintiff must demonstrate that an employer uses "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Ricci*, 557 U.S. at 578; *see also Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 481 (9th Cir. 1983) (a plaintiff must establish that "a facially neutral employment practice has a 'significantly discriminatory' impact upon a group protected by Title VII") (quoting *Connecticut v. Teal*, 457 U.S. 440 (1982)).

In the complaint, Kurdi asserts that Caltrans breached its duty under 42 U.S.C. § 2000e–2(a)(2) "by limiting her opportunities for advancement, denying training, and removing her from work sites when the perpetrators should have been removed." (Doc. 1 at ¶ 250.) This is insufficient to state a plausible disparate impact claim. First, Plaintiff does not identify the specific practice or policy she is challenging or allege that the policy is facially neutral. Moreover, none of these alleged "breaches" are violations of policies. *See Smith*, 544 U.S. at 241 (explaining that in a disparate impact case, a plaintiff is "responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities") (emphasis in original) (internal quotation marks omitted); *see also Hines v. California Pub. Utilities Comm'n*, 467 F. App'x 639, 641 (9th Cir. 2012) ("The district court properly dismissed the disparate impact claim because [plaintiff] failed to allege facts identifying a specific, facially neutral employment practice, or sufficient to show a causal relationship between such a practice and its adverse impact on African–American employees."). Naturally, Kurdi also fails to allege facts supporting a causal connection between any policy and her race or sex. (*See* Doc. 1 at ¶¶ 13, 40.) Following the reasoning in *Hines*, Kurdi's claim must be dismissed.

Finally, and perhaps most importantly, Kurdi does not allege how Caltrans' practices affected *anyone*—regardless of race or sex—besides her. The entirety of Kurdi's allegations consist of acts directed at her individually. Because the complaint is devoid of any factual support that Caltrans' policies or practices had an adverse effect on a protected class, such as women or Arab-Muslims generally, Kurdi fails to state a claim for disparate impact under Title VII. *See Connecticut*, 457 U.S.

at 459 ("There can be no violation of Title VII on the basis of disparate impact in the absence of disparate impact on a *group*.") (Powell, L., dissenting) (emphasis in original).

In sum, Kurdi states plausible claims for Title VII retaliation based upon her transfer from the field to office work; and Title VII sex discrimination based on a hostile work environment. Kurdi's remaining Title VII claims are **DISMISSED** without prejudice.

## IV.    Leave to Amend

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations, internal quotation marks omitted). When dismissing a complaint for failure to state a claim, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Id*. at 1130 (internal quotation marks omitted). Accordingly, leave to amend generally should be denied only if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the moving party has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publishing*, 512 F.3d 522, 532 (9th Cir. 2008).

Due to the ambiguity of Kurdi's allegations, the Court has insufficient information to conclude that amendment would be futile. It is possible that the deficiencies identified herein may be cured by amending the complaint. Thus, it does not undoubtedly appear amendment would be futile.[19] Furthermore, it does not appear amendment would cause undue delay at this juncture, and there is no evidence Kurdi acted in bad faith. Thus, leave to amend is appropriate.

## IV.    Conclusion and Order

For the reasons set forth above, the Court **ORDERS**:

1.    Defendant's motion to dismiss is **GRANTED** with the following exceptions:

a.    The motion is **DENIED** as to Plaintiff's Title VII retaliation claim based upon her transfer to office work **only** and **GRANTED** in all other respects.

---

[19] Kurdi is encouraged to examine the pleading requirements for administrative exhaustion under Title VII before drafting her amended complaint.

      b.    The motion is **DENIED** as to Plaintiff's Title VII sex discrimination based on a hostile work environment.

2.    All remaining claims are **DISMISSED** without prejudice.

3.    Plaintiff **SHALL** file any First Amended Complaint within thirty days of the date of service of this order. **If Plaintiff fails to file an amended complaint, the action may be dismissed without prejudice for failure to prosecute and failure to obey the Court's order**.

IT IS SO ORDERED.

Dated:   **January 16, 2023**

UNITED STATES DISTRICT JUDGE